SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-03-0420-AP |
| Appellee, | ) |
| | ) Maricopa County Superior |
| v. | ) Court |
| | ) No. CR 01-01604 |
| RUBEN MYRAN JOHNSON, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Thomas W. O'Toole, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
        By    Kent E. Cattani, Chief Counsel
              Capital Litigation Section
              Robert J. Gorman, Jr.                       Tucson
              Assistant Attorney General
Attorneys for the State of Arizona

KERRIE M. DROBAN                                       Scottsdale
Attorney for Ruben Myran Johnson
_____

**M c G R E G O R**, Chief Justice

¶1      A grand jury indicted Ruben Myran Johnson for first degree murder, assisting a criminal syndicate or criminal street gang, burglary in the first degree, and armed robbery.  On November 28, 2001, a jury found Johnson guilty of all four counts.  At the conclusion of the aggravation phase of the sentencing proceeding, a different jury found three aggravating factors proved beyond a reasonable doubt:  (1) Johnson was

previously convicted of a serious offense, Ariz. Rev. Stat. (A.R.S.) § 13-703.F.2 (2001); (2) Johnson knowingly created a grave risk of death to another person in addition to the person murdered, A.R.S. § 13-702.F.3; and (3) Johnson committed the offense in an especially heinous and depraved manner, A.R.S. § 13-703.F.6.[1]  In the penalty phase, that same jury determined that Johnson should receive the death sentence for the charge of first degree murder.  The trial court sentenced him to death for the murder and to consecutive, aggravated terms on the non-capital charges.  The clerk filed an automatic notice of appeal from the judgment and sentence pursuant to Rule 31.2.b of the Arizona Rules of Criminal Procedure.  This Court has jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution, and sections 13-4031 and -4033.A of the Arizona Revised Statutes.

## I.

¶2      On November 7, 2000, Ruben Johnson and Jarvis Ross, both members of the Lindo Park Crips Gang (the LPC), committed a robbery at the Affordable Massage business in Phoenix.  They

---

[1]      Because Johnson's trial occurred before *Ring v. Arizona*, 536 U.S. 584 (2002), was decided, the jury for the guilt proceeding was not required to find the presence or absence of aggravating factors.  After finding Johnson guilty on all four counts, the jury was dismissed.  Between Johnson's conviction on November 28, 2001, and January 8, 2003, Johnson's sentencing hearing was continued six times.  Following a stay and yet

2

committed the robbery at the behest of Johnson's friend, Cheryl Newberry. Newberry drove Johnson and Ross to the Affordable Massage location. Johnson and Ross then entered the massage parlor through a back door and confronted Stephanie Smith and Russell Biondo. Johnson and Ross stole Biondo's wallet and pager and Smith's cell phone and left the massage parlor separately. Johnson escaped, but police officers captured Ross after a short chase. Smith and Biondo both identified Ross as one of the robbers.

¶3        Soon after the robbery, Johnson learned from his friend Phyllis Hansen, a clerk at the Maryvale Justice Court, that Ross's preliminary hearing was scheduled for November 15, 2000, and that the victims were going to testify at the preliminary hearing. Newberry later testified that Johnson and two other men came to her home in an SUV and made her reveal the location of Stephanie Smith's residence.

¶4        Johnson and Quindell Carter, a fellow gang member, arrived at Smith's home shortly after one o'clock on the morning of November 15, 2000. Smith was in a bedroom reading a story to her four-year-old son, Jordan. Leonard Justice and Mike Solo were also at her home visiting. Solo heard a dog barking behind the house and went into the backyard to investigate. When he

_____

another continuance, Johnson's sentencing proceeding commenced on November 12, 2003.

3

got outside, a black male put a gun to Solo's head, threatened to kill him, and asked who else was in the house. The gunman first pushed Solo into the house through the back sliding glass door and then told him to leave the house. Solo hurried to his car and drove away. Leonard Justice looked out the back window of the house, saw what was happening, and called 9-1-1 on his cell phone. He then went into Jordan's bedroom and handed Smith the phone so she could give the dispatcher the address. After handing the phone back to Justice, Smith left the bedroom. Justice followed her, and they both saw Johnson come through the arcadia door. Justice then ran into the bathroom, while Smith ran into Jordan's bedroom. Johnson walked into Jordan's bedroom and shot Smith in the head, killing her. Arriving officers apprehended Quindell Carter after a short chase, but Johnson evaded the officers.

¶5 Two days later, Johnson visited Phyllis Hansen at her home. Hansen testified that Johnson showed her a newspaper article about the murder and told her that he was the unnamed suspect mentioned in the story. Hansen also testified that Johnson stated he killed Smith because Smith was going to testify against "his cuz or one of his homies." Hansen later went to the police and turned over papers Johnson had left at her home. One of those papers had Johnson's fingerprint on it

4

and contained Russell Biondo's name and date of birth written in Johnson's handwriting.

¶6     Johnson raises multiple issues on appeal. We address each of these issues below.

**II.**

**A.**

¶7     The first issue Johnson raises involves the trial court's failure to sever Count 2, assisting a criminal syndicate,[2] from the remaining counts. Two or more offenses may be joined if they:

    (1)  Are of the same or similar character; or
    (2)  Are based on the same conduct or are otherwise
         connected together in their commission; or
    (3)  Are alleged to have been a part of a common
         scheme or plan.

Ariz. R. Crim. P. 13.3.a.

¶8     Before trial, Johnson unsuccessfully moved to sever Count 2. The trial court ruled that because "the defendant noticed several alternative defenses including mistaken identity . . . the evidence in regard to gang activity [was not only] material in regard to Count 2 but also relevant in regard to identity and motive in regard to the remaining counts." Johnson now argues that Count 2 was joined only because it was of "the

---

[2]     A person commits the offense of "assisting a criminal syndicate by committing any felony offense, whether completed or preparatory, with the intent to promote or further the criminal

5

same or similar character" as the other charges and thus he could sever it as a matter of right.

**¶9**       A defendant is entitled to sever offenses joined only by virtue of being of the same or similar character as a matter of right, "unless evidence of the other offense or offenses would be admissible under applicable rules of evidence" if tried separately.  Ariz. R. Crim. P. 13.4.b.  Denial of a motion to sever under Rule 13.4.b constitutes reversible error "if the evidence of other crimes would not have been admitted at trial" for another evidentiary purpose.  *State v. Aguilar*, 209 Ariz. 40, 51 ¶ 38, 97 P.3d 865, 876 (2004) (quoting *State v. Ives*, 187 Ariz. 102, 106, 927 P.2d 762, 766 (1996)).

**¶10**       Count 2 does not fall within Rule 13.4.b.  Assisting a criminal street gang is not of the same or similar character as first degree murder, burglary in the first degree, or armed robbery.  *See State v. Mauro*, 149 Ariz. 24, 28, 716 P.2d 393, 397 (1986) (noting that homicide and child abuse counts were joined under Rule 13.3.a pursuant to the "same conduct" provision and not the "same or similar character" provision), *rev'd on other grounds*, 481 U.S. 520 (1987).

**¶11**       Moreover, as the trial court noted, evidence material to Count 2 could have been admitted to establish motive and

---

objectives of a criminal syndicate."  Ariz. Rev. Stat. (A.R.S.) § 13-2308.C.

6

identity in the armed robbery, murder, and burglary charges. Prejudice from a failure to sever is unlikely "[i]f the evidence of one crime would have been admissible in a separate trial for the others." *State v. Stuard*, 176 Ariz. 589, 596, 863 P.2d 881, 888 (1993). In addition, if "testimony is probative on the crucial issue of identification[,] any slight prejudicial element is clearly outweighed by [the] probative value." *United States v. Buck*, 548 F.2d 871, 876 (9th Cir. 1977).

¶12    We agree that evidence material to Count 2 was admissible to establish motive and identity for Johnson's other crimes.[3] The murder of Stephanie Smith resulted from Johnson's desire to eliminate a witness to an armed robbery with which Jarvis Ross, Johnson's "cuz" or "homeboy," was being charged. The State presented ample evidence to establish that the motivation behind the armed robbery and the murder of Stephanie Smith was to further the criminal objectives of the LPC.[4] For

---

[3]    Likewise, as noted by the trial court, evidence relating to the other counts was admissible to prove Count 2:

> The specific language of Count 2 [alleging that the defendant assisted a criminal street gang by committing first degree murder and/or armed robbery] . . . necessarily includes proof of Counts 1, 3, and 4. So if Count 2 was severed, it would require for all practical purposes, a duplicative trial presumably with identical or nearly identical evidence.

[4]    Johnson also argues that because the State had ample testimony and evidence to tie the crimes together merely by establishing that Johnson's motive to kill Smith was to protect

example, the three individuals involved in the murder and robbery were all members of or affiliated with the LPC; as an original gangster (O.G.), Johnson had an obligation to "bring up," or look after, younger gang members such as Jarvis Ross; Damon Ross, another LPC O.G., went with Johnson to locate Smith's house; and Johnson told Phyllis Hansen that he killed Smith to keep her from testifying against his "cuz," or fellow gang member, referring to Jarvis Ross. The evidence of gang involvement provided a motive for Johnson to kill Smith, who had no connection with Johnson other than her role as a witness against his fellow gang member. The State provided evidence that these acts were consistent with the LPC's typical criminal activity of pursuing pecuniary gain and intimidating witnesses. The evidence of Johnson's gang involvement helped to establish his identity and motive for committing the other charged crimes.

---

his friend, Jarvis Ross, the State did not need to show they were fellow gang members. *See State v. Williams*, 183 Ariz. 368, 376, 904 P.2d 437, 445 (1995) (noting possible alternative explanations for why a defendant might shoot someone rather than to conceal a crime would go to the weight of the evidence and not to its admissibility). Although there could have been non-gang-related motivations for Johnson to shoot Stephanie Smith (e.g., to protect a friend), the trial court correctly noted that the State is not obligated to limit its case by presenting evidence of lesser import.

¶13     In addition, the trial judge took several steps to reduce any prejudice that could have resulted from joinder.[5] First, prior to opening statements, the court cautioned the State against misusing the gang evidence and instructed it to avoid presenting evidence of any gang motivation until later in the case, when its relevance became clear.  Second, the court instructed the jury to consider each offense separately and advised that each must be proven beyond a reasonable doubt. "[A] defendant is not prejudiced by a denial of severance where the jury is instructed to consider each offense separately and advised that each must be proven beyond a reasonable doubt." *State v. Prince*, 204 Ariz. 156, 160 ¶ 17, 61 P.3d 450, 454 (2003) (citing holding in *State v. Atwood*, 171 Ariz. 576, 613, 832 P.2d 593, 630 (1992)).

¶14     Under the circumstances of this case, we conclude that the trial court did not abuse its discretion in refusing to sever Count 2.

---

[5]    Although it is unclear from the record whether the court determined Count 2 was properly joined pursuant to Rule 13.3.a(2) or a(3), the joinder of the counts is most consistent with 13.3.a(2), which applies to two or more offenses that are "based on the same conduct" or "otherwise connected together in their commission."  Ariz. R. Crim. P. 13.3.a(2); *see also State v. Prion*, 203 Ariz. 157, 162 ¶ 32, 52 P.3d 189, 194 (2002) (defining "otherwise connected together in their commission" as situation in which "evidence of the two crimes [i]s so intertwined and related that much the same evidence [i]s relevant to and would prove both, and the crimes themselves arose out of a series of connected acts").

9

**B.**

¶15    Johnson also asserts that the F.3 and F.6 aggravators are facially vague and that the trial court's jury instruction defining these factors provided jurors with insufficient guidance and failed to appropriately channel the jury's discretion.  We review de novo whether instructions to the jury properly state the law.  *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).  We review a trial court's denial of a requested jury instruction for an abuse of discretion.  *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).

**1.**

¶16    Johnson argues that the trial court's jury instruction on the F.3 aggravator, which applies when a defendant "knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense," A.R.S. § 13-703.F.3, is unconstitutionally vague. Johnson also contends that the phrase "zone of danger," which was used in the F.3 instruction, is inherently vague.

¶17    This Court has previously rejected Johnson's argument, concluding that because an F.3 aggravating circumstance may be found only when others are "physically present in the zone of danger" and may not be found when others are simply in another room, or are intended victims, "[t]he aggravating circumstance is sufficiently precise to avoid its arbitrary application."

10

*State v. McMurtrey*, 151 Ariz. 105, 108, 726 P.2d 202, 205 (1986).

**¶18**     Even if the F.3 aggravator were vague, under *Walton v. Arizona*, 497 U.S. 639, 652-53 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), a court can remedy vagueness by giving instructions that clarify its meaning. The trial court did so in this case: the court's instructions to the jury tracked the language of A.R.S. § 13-703.F.3 and correctly stated that the standard of inquiry for the F.3 aggravator is whether, during the course of the killing, "the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injury." *State v. Wood*, 180 Ariz. 53, 69, 881 P.2d 1158, 1174 (1994). The trial court also instructed jurors that the "mere presence of bystanders" is insufficient to support the finding of an F.3 aggravator, *id.*, and that actual intent to kill the bystander precludes an F.3 finding, *see State v. Tison*, 129 Ariz. 526, 542, 633 P.2d 335, 351 (1981). Moreover, the instruction given to explain the F.3 aggravator substantially reflected Johnson's requested jury instruction. We find no error and conclude that the trial court's instruction on the F.3 aggravator provided sufficient guidance to channel the jury's discretion.

**2.**

¶19    Johnson next argues that the trial court's jury instruction on the F.6 aggravator was unconstitutionally vague because it failed to distinguish for jurors which murders should be considered especially heinous, cruel, or depraved.  Johnson contends that the term "especially" in section 13-703.F.6 essentially requires some kind of comparison between death-eligible murder cases and the "norm."  Because Arizona law prohibits proportionality review, Johnson claims that the F.6 language fails to provide jurors adequate context for deciding whether certain aggravating circumstances warrant the death penalty.

¶20    This Court squarely rejected proportionality review in *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992), which adopted Justice Moeller's concurrence in *State v. Greenway*, 170 Ariz. 155, 173, 823 P.2d 22, 38 (1991).  In *Greenway*, Justice Moeller agreed with the majority holding that "[t]he trial court's consideration of other similarly situated defendants is irrelevant to *this* defendant's 'character or record,' and does not show any of the circumstances surrounding *this* defendant's 'offense' that would call for a sentence less than death."  *Id.* at 173, 823 P.2d at 40 (Moeller, J., concurring) (quoting majority opinion) (alteration in original).

Justice Moeller also noted that allowing such a proportionality review would create a "slippery slope":

> If meaningful proportionality reviews are to be conducted with the parties' participation, it seems obvious that the courts in such cases will soon be litigating not one murder case, but scores or, indeed, hundreds of murder cases in every potential capital case. One may also reasonably predict that when a defendant under a death sentence at last exhausts his other remedies and nears an execution date, he will seek an updated proportionality review to include capital cases which have accrued during the years since his own death sentence was imposed. . . . [I]f carried to its logical conclusion, [proportionality review] will inevitably result in all death penalty cases becoming so bogged down that it will be virtually impossible to conclude any of them.

*Id.* (Moeller, J., concurring). The reasoning of *Salazar* applies equally regardless whether a defendant asks a trial judge or a jury to conduct a proportionality review. Accordingly, we reject Johnson's argument.

**¶21** Johnson also argues that the trial court's jury instructions on the F.6 aggravator were unconstitutionally vague and deprived him of a fair sentencing. In *State v. Anderson*, this Court recently rejected the argument that the language of the F.6 aggravator, which requires that a crime be "especially cruel, heinous, or depraved," is unconstitutionally vague. 210 Ariz. 327, 352-53 ¶¶ 109-11, 111 P.3d 369, 394-95 (2005). We held, "Our 'narrowing construction[s]'" have given "'substance' to the facially vague aggravator, and the sentencing judge was presumed to apply those constructions because trial judges 'know

13

the law and . . . apply it in making their decisions.'" *Id.* at 352 ¶ 109, 111 P.3d at 394 (quoting *Walton*, 497 U.S. at 653-54) (alterations in original).[6]

**¶22**     The trial judge in this action provided an appropriate narrowing construction when he instructed the jury about the meanings of "heinous" and "depraved."[7]     The trial court's detailed definitions for "heinous" and "depraved" followed prior case law and provided sufficient guidance to the jury to correct any potential vagueness.     *See, e.g.*, *State v. Murdaugh*, 209 Ariz. 19, 31 ¶ 57, 97 P.3d 844, 856 (2004) (defining heinous and depraved); *State v. Greene*, 192 Ariz. 431, 440 ¶ 34, 967 P.2d 106, 115 (1998) (defining relishing); *State v. Ross*, 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994) (defining witness elimination); *State v. Gretzler*, 135 Ariz. 42, 52-53, 659 P.2d

---

[6]     This Court also rejected Anderson's challenge that the decision in *Walton* would not save a facially vague F.6 aggravator when a jury, as opposed to a judge, performs the initial fact-finding function because the jury instructions given were "adequate to provide a narrowed construction of the facially vague statutory terms." *State v. Anderson*, 210 Ariz. 327, 353 ¶¶ 112-14, 111 P.3d 369, 395 (2005).

[7]     Because the jury did not unanimously find especial cruelty and therefore could not have relied on this aggravator in imposing death, we need not address Johnson's arguments related to the cruelty instruction. *See State v. Rodriguez*, 192 Ariz. 58, 63 ¶ 27, 961 P.2d 1006, 1011 (1998) (stating court will not reverse a conviction if it can conclude beyond a reasonable doubt that an error did not influence the verdict).

14

1, 11-12 (1983) (discussing relishing, senselessness, and helplessness).

**¶23** Johnson also contends that the trial court's instruction as to "relishing," one of the mental states that allows a jury to find an action is heinous or depraved, referred to the defendant's state of mind only "at the time of the offense," rather than to his state of mind "near the time of the offense." We have upheld instructions stating that relishing can be shown either "at the time" of the offense or "at or near" the time of the offense and find no error.[8] *See, e.g.*, *Greene*, 192 Ariz. at 440-41 ¶ 39, 967 P.2d at 115-16 ("[P]ost-murder statements suggesting indifference, callousness, or a lack of remorse constitute 'relishing,' only when they indicate, beyond a reasonable doubt, that the killer savored or enjoyed the murder at or near the time of the murder."); *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10 ("[H]einous and depraved involve a killer's vile state of mind at the time of the murder.").[9]

---

[8] In fact, the trial court's instruction, which referred to Johnson's state of mind "at the time of the offense," actually favored him because the State relied on evidence of Johnson's actions and statements shortly after, not *at*, the time of the murder to establish relishing. Adopting Johnson's suggested instruction actually would have increased, not decreased, the likelihood that a reasonable jury would find that he relished the murder.

[9] While we conclude that the instructions given were sufficient to guide and channel the jury's discretion, we commend the instructions given in *Anderson*, 210 Ariz. at 352-53

15

## C.

¶24    Johnson filed a motion in limine to preclude gang-related evidence in the aggravation phase and the penalty phase. He argues that the gang evidence is prejudicial and irrelevant and that A.R.S. § 13-703.F, which defines aggravating circumstances, does not provide for the admission of evidence about or reference to gangs.  The trial court denied his motion, stating that "as it relates to witness elimination as the motive for the murder, . . . gang membership is probative at the aggravation phase [to establish heinousness or depravity] and [its] probative value outweighs any prejudicial effect."

¶25    The rules of evidence govern the admissibility of information relevant to any of the aggravating circumstances set forth in A.R.S. § 13-703.F.  A.R.S. § 13-703.B (Supp. 2005).  We

_____

¶ 111 n.19, 111 P.3d at 394-95 n.19, on "relishing."    In *Anderson*, the judge instructed the jury as follows:

> In order to relish a murder the defendant must show by his words or actions that he savored the murder. These words or actions must show debasement or perversion, and not merely that the defendant has a vile state of mind or callous attitude.
>
> Statements suggesting indifference, as well as those reflecting the calculated plan to kill, satisfaction over the apparent success of the plan, extreme callousness, lack of remorse, or bragging after the murder are not enough unless there is evidence that the defendant actually relished the act of murder at or near the time of the killing.

*Id.*

16

will not disturb the trial court's evidentiary rulings absent an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 308 ¶ 47, 4 P.3d 345, 363 (2000). "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b). Such evidence, however, may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

¶26 Other jurisdictions have held that evidence of gang affiliation is allowed under circumstances similar to those of this case. For instance, in *People v. Champion*, the prosecution offered substantial evidence that the Raymond Avenue Crips were involved in a triple murder. 891 P.2d 93, 116 (Cal. 1995), *abrogation on other grounds recognized by People v. Combs*, 101 P.3d 1007, 1033 (Cal. 2004). In *Champion*, the California Supreme Court concluded that evidence "that defendants were members of the same gang formed a significant evidentiary link in the chain of proof tying them to the crimes in [the] case." *Id*. As was true in *Champion*, evidence that Johnson was a member of the same gang as his co-conspirators fortified the testimony of the witnesses identifying witness elimination as his motive for killing Stephanie Smith. *See also State v. Ross*, 127 P.3d 249, 255 (Kan. 2006) (stating that gang affiliation evidence is admissible "to establish a motive for an otherwise inexplicable

17

act"); *State v. Ferguson*, 581 N.W.2d 824, 834-35 (Minn. 1998) (concluding that trial court did not abuse its discretion in admitting photographs and testimony on gang graffiti; although the pictures "may have been highly prejudicial, the evidence was also highly probative of [defendant's] alleged motive to kill").

¶27     The court of appeals reached a similar conclusion in *State v. Romero*, 178 Ariz. 45, 870 P.2d 1141 (App. 1993).  In *Romero*, evidence that the defendant was a Hollywood Gang member, that the attack occurred in rival gang territory, and that at least some of the victims were present or former rival gang members, was sufficient for the jury to find "a motive for what otherwise would have been a random and unprovoked attack."  *Id*. at 52, 870 P.2d at 1148.  Similarly, an abundance of evidence linked Johnson, his crimes, and his affiliation with the Lindo Park Crips.  Most notably, evidence that demonstrated Johnson's motive to murder Stephanie Smith included the facts that the crimes involved other affiliated gang members, that Johnson asked Phyllis Hansen whether any charges had been filed against Ross, and that Johnson told Phyllis Hansen that "[Smith] was going to testify against his cuz . . . and if there was no testimony from her that there would be no case against [Ross]."

¶28     We also reject Johnson's argument that the gang evidence was unduly prejudicial.  Although evidence that a criminal defendant is a member of a gang could have a "'highly

18

inflammatory impact'" on a jury, *Champion*, 891 P.2d at 116 (quoting *People v. Cox*, 809 P.2d 351, 373 (Cal. 1991)), the trial court carefully scrutinized the evidence in this case and reasonably concluded that its probative value was not substantially outweighed by its prejudicial effect. Because the evidence of gang affiliation was particularly probative on the issue of motive, the trial court did not abuse its discretion in permitting its introduction in the aggravation phase.

**D.**

¶29 During jury selection for the sentencing proceeding, Johnson asked the court to strike the entire panel for cause, based on the trial court's failure to permit him to *voir dire* the jurors to ask whether they regarded specific factors, such as substance abuse, difficult childhood, and psychological problems, as mitigating factors.[10] Johnson cites *Eddings v. Oklahoma*, 455 U.S. 104 (1982), for the proposition that a "capital sentencer *must* give effect to *all* relevant mitigating evidence." Additionally, Johnson argues that *Morgan v.*

---

[10] Johnson argues that Juror No. 116, who initially stated that he viewed alcoholism as an aggravating circumstance, provided a perfect demonstration of why he should have been allowed to *voir dire* jurors on specific mitigating circumstances. Juror No. 116, however, was not selected for the aggravation and penalty phase jury panel, and any error involving *voir dire* of this particular juror therefore is harmless. *State v. Glassel*, 211 Ariz. 33, ___ ¶ 41, 116 P.3d 1193, 1206 (2005) (finding that any error in *voir dire* of

19

*Illinois*, 504 U.S. 719 (1992), implies that general fairness and "follow the law" questions alone are insufficient to ensure against a death-biased jury. Based on these contentions, Johnson argues he did not receive a fair trial by impartial jurors. This Court reviews a trial court's rulings involving the *voir dire* of prospective jurors for abuse of discretion, *State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997).

¶30     In *State v. Glassel*, 211 Ariz. 33, ____ ¶¶ 42-44, 116 P.3d 1193, 1207 (2005), this Court recently rejected arguments similar to those raised by Johnson. Glassel argued that the trial court abused its discretion by refusing to allow him to ask prospective jurors open-ended questions about what type of mitigating evidence would be important to them in deciding whether to impose the death penalty. *Id.* at ___ ¶ 42, 116 P.3d at 1207. He contended that such questions were "necessary to determine which prospective jurors, in violation of *Morgan*, would automatically impose the death sentence despite the jurors' assurance that they could be fair and impartial." *Id.* at ___ ¶ 43, 116 P.3d at 1207. Finding no abuse of discretion, we rejected his arguments, noting that Glassel cited no authority to support his contention and that the trial court

---

specific jurors was harmless when those jurors did not take part in deliberations).

20

"*did* permit Glassel to ask open-ended questions on several occasions." *Id*. at ___ ¶ 44, 116 P.3d at 1207 (emphasis added).

¶31    Johnson also has cited no authority that requires a court to allow a defendant to *voir dire* potential jurors about specific mitigating circumstances. Extant authority unanimously rejects this argument. *See, e.g.*, *Sellers v. Ward*, 135 F.3d 1333, 1341-42 (10th Cir. 1998) (rejecting argument that a defendant can inquire whether jurors would find specific facts mitigating); *Woodall v. Kentucky*, 63 S.W.3d 104, 116 (Ky. 2001) (finding no abuse of discretion when trial judge prohibited questions about specific mitigating factors such as low I.Q. to prevent defendant from "oblig[ing] jurors to commit themselves by either accepting a specific mitigator or rejecting it before any evidence was heard"); *Burch v. State*, 696 A.2d 443, 464 (Md. 1997) ("A defendant has no right to question prospective jurors, under the guise of searching for disqualifying bias, to see who might be receptive to any of the myriad of potential mitigating factors he or she may choose to present."); *Holland v. State*, 705 So. 2d 307, 338-39 (Miss. 1997) (refusing defendant's request to ask jurors whether alcohol consumption would be regarded as a mitigating factor was not abuse of discretion); *State v. Wilson*, 659 N.E.2d 292, 301 (Ohio 1996) (stating "*Morgan* does not require judges to allow individual voir dire on separate mitigating factors" because "jurors cannot be asked to

21

weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law"); *Cannon v. State*, 961 P.2d 838, 845 (Okla. Crim. App. 1998) (finding no abuse of discretion in trial judge's refusal to permit *voir dire* inquiry into jurors' views on particular mitigating factors); *State v. Hill*, 501 S.E.2d 122, 127 (S.C. 1998) (stating *Morgan* held the defendant was entitled to know "if jurors would consider *general* mitigating evidence . . . [not] that the defendant was entitled to know if a juror would consider *specific* mitigating evidence") (emphasis added); *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998) ("A trial court does not abuse its discretion by refusing to allow a defendant to ask venire members questions based on facts peculiar to the case on trial (e.g. questions about particular mitigating evidence).").

¶32    Johnson's argument misconstrues the holding in *Eddings*. In *Eddings*, the Court held that no mitigating evidence may be statutorily precluded from consideration by a trier of fact. 455 U.S. at 113-14. Nowhere in the opinion does the Court suggest that *voir dire* about specific mitigating circumstances is required. In fact, allowing such a procedure could encourage jurors to limit their evaluation of mitigation evidence to only those factors enumerated rather than to make a broader inquiry into all the evidence presented. Such a result would be contrary to the policy behind *Eddings*, which permits

consideration of any relevant mitigating evidence.  *See id.* at 117.

**¶33**      Nor does *Morgan* support Johnson's argument.  In *Morgan*, the Supreme Court held that "defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law," and therefore, "defendants are entitled to address this issue during voir dire."  *Jones*, 197 Ariz. at 303 ¶ 27, 4 P.3d at 358 (construing *Morgan*).  As we noted in *Glassel*, however, "'[t]he Constitution . . . does not dictate a catechism for *voir dire*,'" 211 Ariz. at ____ ¶ 37, 116 P.3d at 1205-06 (quoting *Morgan*, 504 U.S. at 729) (alteration in original), and "trial courts have 'great latitude in deciding what questions should be asked on *voir dire*.'"  *Id.* at ____ ¶ 37, 116 P.3d at 1206 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991)).  Although *Morgan* indicates that *voir dire* must go beyond simple questions of "[w]ill you follow the law that I give you?" and "[d]o you have any prefixed ideas about this case at all?", 504 U.S. at 735 n.9, it does not suggest that courts should permit inquiries into specific mitigating circumstances.

**¶34**      Here, the trial court clearly complied with *Morgan* requirements.  Before the aggravation phase, the trial court required each potential juror to fill out a 23-page juror questionnaire that fully addressed *Morgan* issues.  The trial

court also conducted individual *voir dire* of every prospective juror whose responses raised impartiality concerns. Jurors not rehabilitated following individual *voir dire* were dismissed for cause.

¶35    We conclude that the trial court did not abuse its discretion in refusing to allow detailed questioning about specific mitigating factors during *voir dire*.

### E.

¶36    Johnson next contends that the trial court erred by permitting the State to introduce a four-minute video clip of Detective Tom Kulesa's January 2001 interrogation of Johnson during the rebuttal testimony of Dr. Gina Lang, the State's mental health expert. Johnson argues that playing the audio portion of the tape was unduly prejudicial because the tape contained profanity and references to Johnson's unrelated criminal conduct. He contends that the visual images themselves, without the audio, would have been sufficient for jurors to evaluate the credibility of Dr. Lang's diagnosis. Finally, he argues that the error in admitting the tape was not harmless because the trial court failed to instruct jurors to limit their consideration of the tape to a proper purpose.

¶37    "Evidentiary rulings are subject to the trial court's determination and will not be disturbed, absent an abuse of discretion." *Jones*, 197 Ariz. at 308 ¶ 47, 4 P.3d at 363.

"Facts or data underlying [a] testifying expert's opinion are admissible for the limited purpose of showing the basis of that opinion, [but] not to prove the truth of the matter asserted." *State v. Rogovich*, 188 Ariz. 38, 42, 932 P.2d 794, 798 (1997). Dr. Lang testified that, in addition to reports, records, and her own examination of Johnson, she relied on the tape-recording of Detective Kulesa's interrogation of Johnson to diagnose him with a "personality disorder that includes antisocial borderline and histrionic traits."

¶38    The videotape was helpful to jurors in several ways. It demonstrated for the jurors Johnson's histrionic traits, one of the factors that Dr. Lang relied upon in her analysis. In addition to corroborating her diagnosis, the tape served to rebut defense expert Dr. Carlos Jones's testimony that Johnson was not faking his symptoms. *See* A.R.S. § 13-703.D (Supp. 2005) (permitting the prosecution and defendant to rebut any information received at the aggravation or penalty phase of the sentencing proceeding). Although some of the statements made in the interrogation do not reflect positively on Johnson, the trial court did not abuse its discretion in concluding that any potential prejudice from the tape did not outweigh its probative value in helping the jury understand Dr. Lang's diagnosis.

¶39    Also, contrary to Johnson's contention, the trial court specifically limited the jury's use of the videotape to a proper purpose.  The trial court instructed the jury that

> this video is merely offered to help you understand this doctor's opinion . . . as to defendant's various psychological characteristics.  Language in the tape, which you see as Detective Kulesa is talking to the defendant, is not offered for the substance; it is merely offered as part of his, the defendant's behavior, which the Doctor, I believe, says is of histrionic nature.  With that understanding, that's the only purpose [for which] this videotape is being admitted.

¶40    Because the videotape assisted jurors in determining the credibility and accuracy of Dr. Lang's diagnosis and the trial court properly instructed the jury as to the limited purpose of the videotape, we find no abuse of discretion.

**F.**

¶41    Johnson also argues that his Eighth and Fourteenth Amendment rights were violated because the trial court failed to specifically instruct jurors to consider evidence of family dysfunction, substance abuse, and personality disorder as mitigation in the penalty phase jury instructions.  Because of this failure to instruct, Johnson contends, a reasonable probability remains that the jury did not consider principal mitigating evidence.

¶42    During the aggravation phase of a capital trial, "the Eighth Amendment requires that a capital sentencing jury's

discretion be guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty in order to eliminate arbitrariness and capriciousness." *Buchanan v. Angelone*, 522 U.S. 269, 274 (1998) (quoting *Buchanan v. Angelone*, 103 F.3d 344, 347 (4th Cir. 1996)) (internal quotations omitted). "In contrast, in the [penalty] phase, [the Supreme Court has] emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Id.* at 276. The standard for reviewing jury instructions used during the penalty phase of the capital sentencing proceeding is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant [mitigating] evidence.'" *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

¶43    A significant danger could result if we were to adopt Johnson's approach and direct or permit trial courts to give potentially confining mitigation instructions during the penalty phase of a capital trial. The consistent concern in the penalty phase is "that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." *Id.* "[The Supreme Court's] decisions suggest that complete jury discretion is constitutionally permissible." *Id.* (citing *Tuilaepa v.*

27

*California*, 512 U.S. 967, 978-79 (1994), as "noting that at the [penalty] phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion"); *see also Zant v. Stephens*, 462 U.S. 862, 875 (1983) (finding that a scheme permitting jurors unbridled discretion in determining whether to impose the death penalty after eligibility for the death penalty is determined is not unconstitutional).

¶44    The Supreme Court has rejected the argument that judges should instruct capital juries on specific mitigating factors.  *Buchanan*, 522 U.S. at 270 (holding that the Eighth Amendment does not require "that a capital jury be instructed on the concept of mitigating evidence generally, or on particular statutory mitigating factors").  *Buchanan* involved a jury instruction that advised jurors, "[I]f you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the Defendant at life imprisonment."  *Id.* at 272-73 & n.1.  This instruction survived a constitutional challenge because it "did not foreclose the jury's consideration of any mitigating evidence."  *Id.* at 277.

¶45    The instructions given by the trial court clearly satisfy the *Buchanan* test.  The court instructed the jurors that "mitigating circumstances may be *any* factors presented by the defendant or the State that are relevant in determining whether

28

to impose a sentence of less than the death penalty" and that they could consider "*any* aspect of the defendant's background, character, or propensity or record, and *any* of the circumstances of the offense that might justify a penalty less severe than death." (Emphasis added.) *Cf. Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990) (rejecting argument that trial judge's list of statutory mitigating factors impermissibly precluded consideration of other possible mitigation because trial judge instructed jurors that they were "entitled to consider 'any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense'").

¶46 The jury had ample opportunity to consider all the evidence related to mitigation. Johnson presented witnesses and evidence to establish possible mitigating factors over a three-day period. Given the focus Johnson placed on the mitigating factors and the time allotted to present and argue the evidence, we see no reasonable likelihood that the jury found itself foreclosed from considering potentially mitigating evidence of family dysfunction and substance abuse. *See Buchanan*, 522 U.S. at 278 (stating that it is "unlikely that reasonable jurors would believe that the court's instructions transformed four days of defense testimony on the defendant's background and character into a virtual charade") (citation and internal quotation omitted).

¶47     Accepting Johnson's argument that a trial court should be required to provide a list of specific mitigating factors to the jury "would be inharmonious with the Supreme Court's admonitions that the sentencer be free to consider *any* relevant mitigating factor." *Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir. 1984) (emphasis added)*; see also Eddings*, 455 U.S. at 112. The sort of specificity Johnson requests "would doubtless bring complaints from other petitioners that the trial court had unduly narrowed the focus of the jury's consideration."[11] *Tucker*, 724 F.2d at 892.   The trial court did not abuse its discretion in refusing to instruct the jury on specific mitigating factors.

### III.

¶48     Because Johnson's crime occurred before August 1, 2002, we independently review the jury's "findings of aggravation and mitigation and the propriety of the death sentence."   A.R.S. § 13-703.04.A*; see also* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7.B.   "[W]e consider the quality and strength, not simply the number, of aggravating and mitigating factors."   *Greene*, 192 Ariz. at 443 ¶ 60, 967 P.2d at 118.

---

[11]    We also note that even though the trial court did not specifically instruct the jury on family dysfunction and substance abuse, during final arguments, Johnson's counsel

30

**A.**

¶49     In this case, the jury found three aggravators:  (1) prior conviction for the serious offense of armed robbery; (2) grave risk of death to a third party; and (3) that the murder was especially heinous and depraved.  A.R.S. § 13-703.F.2, F.3, F.6.

**1.**

¶50     A defendant is eligible for the death penalty if he was "previously convicted of a serious offense, whether preparatory or completed."  A.R.S. § 13-703.F.2.  A serious offense includes armed robbery.  A.R.S. § 13-703.I(8) (Supp. 2005).  Johnson did not dispute his prior conviction for the serious offense of armed robbery.

**2.**

¶51     Under section 13-703.F.3, an aggravating circumstance exists if "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense."  The question in this case was whether Johnson created a grave risk of danger to Jordan, the victim's young son.  Factors relevant to our analysis include:  (1) the third person's proximity to the victim (whether the third person was

_____

argued the presence of specific mitigating circumstances not elaborated by the final penalty phase jury instructions.

31

in the "zone of danger"), *see Wood*, 180 Ariz. at 69, 881 P.2d at 1174; (2) whether the defendant's actions were during "the murderous act itself," *see State v. McCall*, 139 Ariz. 147, 160, 677 P.2d 920, 933 (1983); (3) whether the defendant intended to kill the third party, *see Tison*, 129 Ariz. at 542, 633 P.2d at 351; and (4) whether the defendant engaged in sufficiently risky behavior toward the third person, *see State v. Jeffers*, 135 Ariz. 404, 428-29, 661 P.2d 1105, 1129-30 (1983). "No single factor is dispositive of this circumstance. Our inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injury." *Wood*, 180 Ariz. at 69, 881 P.2d at 1174.

¶52 Substantial evidence supports the F.3 aggravator. It is clear that any potential risk to Jordan took place during "the murderous act itself" because Jordan was in the same room as Smith at the time she was shot. It is also evident that Johnson did not intend to kill Jordan. His motive was to kill Smith because she was a witness to another crime. Moreover, upon entering Smith's property, he said, "We're here for the bitch," indicating his intention to kill Smith. The exact proximity of Jordan to his mother, however, is unclear. The "mere presence of bystanders" is insufficient to show this

32

aggravator, but the F.3 aggravator is not limited to cases in which the third party was directly in the line of fire. *Id.*

¶53    Even if Jordan was not in his mother's arms at the time of the shooting, clearly he was in the zone of danger. Jordan and his mother were in a small bedroom, measuring 10 feet by 10 feet, and he was in close enough proximity when she was shot to have her blood splatter on his cheek and shirt. *See State v. Gonzales*, 181 Ariz. 502, 514, 892 P.2d 838, 850 (1995) (finding that wife confined to 10 feet by 10 feet courtyard with the defendant as he stabbed her husband was in grave risk of death; she attempted to rescue her husband by jumping on the defendant's back as he was stabbing her husband); *State v. Fierro*, 166 Ariz. 539, 550, 804 P.2d 72, 83 (1990) (finding victim's girlfriend was in zone of danger when defendant fired several shots at victim, striking him once and narrowly missing his girlfriend whom the defendant knew was seated nearby). The evidence establishes a "grave risk of death to others."

### 3.

¶54    Because the F.6 aggravator is considered in the disjunctive, we evaluate the terms cruel, heinous, and depraved separately. *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. The jury did not find the aggravating factor of especial cruelty but did find the murder both heinous and depraved.

¶55    Heinousness and depravity go to a defendant's mental state as reflected in his words and actions at or near the time of the offense. *State v. Martinez-Villareal*, 145 Ariz. 441, 451, 702 P.2d 670, 680 (1985). Heinousness is generally defined as "hatefully or shockingly evil: grossly bad." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977) (citing Webster's Third New International Dictionary). Depravity is generally defined as "marked by debasement, corruption, perversion or deterioration." *Id.*

¶56    *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11, and *Ross*, 180 Ariz. at 606, 886 P.2d at 1362, set forth six factors to be considered in determining whether a defendant's state of mind was especially heinous or depraved. One of these factors is witness elimination as a motive for the murder. *Ross*, 180 Ariz. at 606, 886 P.2d at 1362.

¶57    The State can establish witness elimination as a motive by showing: (1) "[that] the murder victim is a witness to some other crime, and is killed to prevent that person from testifying about the other crime"; (2) "a statement by the defendant that witness elimination is a motive for the murder"; or (3) that "extraordinary circumstances of the crime show, beyond a reasonable doubt, that witness elimination is a motive." *Id*. *State v. King* held that witness elimination, by itself, is not sufficient to raise a murder "above the norm" and

34

cannot support a finding of heinousness or depravity. 180 Ariz. 268, 286-87, 883 P.2d 1024, 1042-43 (1994).

¶58     *King* involved the elimination of a witness who was also a victim of the *same* crime rather than the elimination of a witness to some *other* crime. *Id.* at 270, 883 P.2d at 1026 (store clerk and security guard killed during robbery). As Justice Moeller's concurrence in *King* correctly noted, however, under some circumstances witness elimination itself can support a finding of heinousness or depravity. *Id.* at 290, 883 P.2d at 1046 (Moeller, V.C.J., concurring). For example, "such a case might be the murder of a government witness arranged by gangs or organized crime under circumstances not falling within the aggravating pecuniary value provisions of § 13-703(F)(4) or (5)." *Id.* (Moeller, V.C.J., concurring). We agree that, under the circumstances underlying the *King* decision, witness elimination did not establish heinousness or depravity. We hold, however, that the broad statement in *King* does not apply when a capital defendant eliminates the witness to a crime *other than the murder* to prevent that witness from testifying. In such a situation, witness elimination, by itself, will justify a finding of heinousness or depravity.

¶59     "Ending the life of a human being so that that person cannot testify against the defendant indicates a complete lack of understanding of the value of a human life." *State v. Smith*,

35

141 Ariz. 510, 512, 687 P.2d 1265, 1267 (1984); *see also State v. Correll*, 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986) (noting "depravity is indicated" where witness elimination occurs). "Killings committed with this cold-blooded logic in mind are especially depraved," *Smith*, 141 Ariz. at 512, 687 P.2d at 1267, and "separate the crime from the 'norm' of first-degree murders," *Gretzler*, 135 Ariz. at 53, 659 P.2d at 12. Accordingly, we are persuaded that witness elimination can itself be sufficient to find heinousness or depravity when a witness to *some other crime* is eliminated to prevent that witness from testifying.

¶60     In so holding, we do not transform witness elimination into a "*per se* aggravating factor" as discussed in *King*, 180 Ariz. at 285-86, 883 P.2d at 1041-42. Instead, we uphold *Ross's* distinction between the elimination of the victim of the capital crime, which "would be present in every murder" and the elimination of a witness to *another* crime, 180 Ariz. at 606, 886 P.2d at 1362, which is a separate and serious act.

¶61     In this case, strong and uncontroverted evidence supports witness elimination as a motive for the murder of Stephanie Smith. First, Smith was a witness to "some other crime," the robbery at Affordable Massage on November 7, 2000. Second, the State presented evidence that Johnson made statements to Phyllis Hansen admitting that his motive for

killing Smith was to eliminate her as a witness. Indeed, on appeal, Johnson does not contest that the evidence established witness elimination as the motive for killing Smith.

¶62     Given the strength of the evidence establishing witness elimination as Johnson's motive for killing Smith, this factor, by itself, establishes the F.6 aggravator.[12]

## B.

¶63     Johnson alleges a myriad of statutory and nonstatutory mitigating circumstances including brain damage, chronic substance abuse, borderline and antisocial personality disorder, dysfunctional family background, love of his family, and disparity of treatment of his co-defendant.

¶64     Although Johnson presented some evidence of frontal brain dysfunction and some level of memory and executive function impairment through Dr. Carlos Jones's testimony, both the State's and Johnson's psychological experts agreed that Johnson's cognitive functions are intact. In fact, Johnson's own expert, Dr. Jones, admitted that "there's not real impairment there" and that Johnson appears to fall within the average range of cognitive ability.

---

[12]     The State also presented evidence of relishing and helplessness, but because we hold that witness elimination can itself be sufficient to find heinousness or depravity when a witness to a crime other than the murder is eliminated to prevent that witness from testifying, we need not address the remaining factors.

¶65     Most of the other mitigating circumstances alleged by Johnson involve some type of mental or psychological impairment. "[T]he weight to be given [to] mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct." *Trostle*, 191 Ariz. at 21, 951 P.2d at 886. "We do not require that a [causal] nexus between the mitigating factors and the crime be established before we consider the mitigation evidence. But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *State v. Newell*, ___ Ariz. ___, ___ ¶ 82, ___ P.3d ___, ___ (2006). In this case, both the State's and Johnson's experts indicated that Johnson knew right from wrong and could not establish a causal nexus between the mitigating factors and Johnson's crime. Accordingly, we afford Johnson's evidence of personality disorders, difficult childhood, and substance abuse only minimal value.

¶66     The remaining mitigation evidence, based on the love of his family and the allegation of discrepancy in sentencing, also is of minimal weight. "[H]is family's love has not stopped him from what amounts to a lifetime of crime." *King*, 180 Ariz. at 289, 883 P.2d at 1045. Moreover, the disparity between the punishment given to Quindell Carter and that given this

defendant is explained by Johnson's larger role in the murder of Stephanie Smith.

¶67     Balancing the *de minimis* mitigation against the three established aggravating factors, we conclude that the mitigating circumstances are not sufficiently substantial to call for leniency.

### IV.

¶68     For purposes of federal review, Johnson raises a number of challenges to the constitutionality of Arizona's death penalty scheme. He concedes that this Court has previously rejected these arguments. Although Johnson failed to offer any argument to support these challenges, we will briefly address each issue.

¶69     First, Johnson contends that A.R.S. § 13-703 is unconstitutional because it permits jurors unfettered discretion to impose a death sentence without adequate guidelines to weigh and consider appropriate factors and fails to provide a principled means to distinguish between those defendants deserving of death and those who do not. We rejected this argument in *State v. Carreon*, 210 Ariz. 54, 75-76 ¶ 117, 107 P.3d 900, 921-22 (2005).

¶70     Second, Johnson contends that Arizona's requirement that mitigating circumstances be proved by a preponderance of the evidence improperly precludes jurors from considering

39

mitigating facts.  We rejected a similar argument in *State v. Medina*, 193 Ariz. 504, 515 ¶ 43, 975 P.2d 94, 105 (1999) (stating "it is not unconstitutional to require the defense to establish mitigating circumstances by a preponderance of the evidence").

¶71    Third, he argues that Arizona's death penalty scheme violates the Fifth, Eighth, and Fourteenth Amendments by shifting the burden of proof and requiring that a capital defendant convince jurors that his life should be spared.  We rejected this argument in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988), and *Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922 (restating holding in *Fulminante*).

¶72    Fourth, he contends that death-biased language in the proceedings prejudiced jurors in favor of the death penalty.  No case in Arizona or in any other jurisdiction has specifically addressed this issue.  In raising this argument, Johnson asserts that use of the words "aggravation phase" connotes to jurors that "aggravation" necessarily exists and invades the province of the jury since it is jurors who must determine whether the State has proven aggravation beyond a reasonable doubt.  He also contends that the word "death" was "peppered liberally" throughout the aggravation and penalty phase instructions and evidences a strong and unconstitutional bias in favor of the death penalty.  We note, however, that Johnson's own requested

40

jury instructions used the terms "aggravation phase" and "death" at least ten times, respectively. Moreover, the trial court's jury instructions during the aggravation phase, taken as whole, clearly indicated to jurors that the purpose of the proceeding was to determine whether the State had established any aggravating factors and that the mere allegation of aggravating factors against Johnson was *not* evidence against him. No reasonable juror would have interpreted these instructions and the use of the words "aggravation phase" as *requiring* a finding of aggravation. Nonetheless, because Johnson failed to develop this argument, we regard it as waived. *Bolton*, 182 Ariz. at 298, 896 P.2d at 838.

¶73 Fifth, Johnson argues that the lack of guidance in the jury's verdict form impedes reviewability because there is no indication which mitigating factors jurors found to exist. We rejected this argument in *State v. Roseberry*, 210 Ariz. 360, 373 n.12, 111 P.3d 402, 415 n.12 (2005).

¶74 Sixth, Johnson argues that the introduction of victim impact evidence shifts the burden of proof to the defendant. We rejected a similar argument in *Carreon*, 210 Ariz. at 72 ¶¶ 90-92, 107 P.3d at 918 (rejecting defendant's argument that victim impact statements admitted after the introduction of his mitigation evidence unduly prejudiced the jury).

¶75     Finally, Johnson contends that the failure of Arizona courts to permit jurors to conduct proportionality review denies him due process of law.  We rejected an identical claim in *State v. Harrod*, 200 Ariz. 309, 320 ¶ 65, 26 P.3d 492, 503 (2001), and *Carreon*, 210 Ariz. at 75 ¶ 115, 107 P.3d at 921.

**V.**

¶76     For the foregoing reasons, we affirm Johnson's convictions and sentences, including the capital sentence.


_____
Ruth V. McGregor, Chief Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice