SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                         ) Arizona Supreme Court
                                          ) No.  CR-06-0143-AP
                      Appellee,           )
                                          ) Maricopa County
            v.                            ) Superior Court
                                          ) No.  CR93-08116
DARREL PETER PANDELI,                     )
                                          ) **O P I N I O N**
                      Appellant.          )
_____   )


Appeal from the Superior Court in Maricopa County
The Honorable Robert L. Gottsfield, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                      Phoenix
      By   Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
           Lacey Alexandra Stover Gard,
           Assistant Attorney General
Attorneys for State of Arizona

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                      Phoenix
      By   Kelley J. Morrissey, Assistant Attorney General
Attorney for Arizona Department of Corrections

DROBAN & COMPANY, P.C.                                        Anthem
      By   Kerrie M. Droban
Attorney for Darrel Peter Pandeli
_____

**B E R C H**, Vice Chief Justice

¶1      Appellant Darrel Peter Pandeli was convicted of first
degree murder in 1997 and sentenced to death in 1998 for the
murder of  Holly  Iler.   On  appeal,  we  affirmed  both  his

conviction and his death sentence. *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 382-83, ¶ 94, 26 P.3d 1136, 1153-54 (2001). In 2002, however, the United States Supreme Court remanded the case for further consideration in light of *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002). *Pandeli v. Arizona* (*Pandeli II*), 536 U.S. 953 (2002) (mem.). We vacated Pandeli's death sentence and remanded the case to the trial court for a new sentencing hearing. *State v. Pandeli* (*Pandeli III*), 204 Ariz. 569, 572, ¶ 11, 65 P.3d 950, 953 (2003) (supp. op.). On remand, a jury determined that Pandeli should be sentenced to death. We have jurisdiction over this capital appeal pursuant to Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

## I. FACTS AND PROCEDURAL BACKGROUND

¶2     Holly Iler's nude body was found in a central Phoenix alley on the morning of September 24, 1993. She had been beaten, her throat had been slashed, and her nipples had been excised after her death. During the course of the police investigation, Pandeli confessed to murdering Iler. A more detailed description of the Iler murder may be found in *Pandeli I*, 200 Ariz. at 370-72, ¶¶ 6-15, 26 P.3d at 1141-43.

¶3     After confessing to the Iler murder, Pandeli admitted that he had previously killed another woman. Teresa Humphreys' body was found on a sidewalk in central Phoenix in January 1992.

She had been stabbed several times in the chest and back, her throat had been slashed, and she suffered extensive defensive wounds to her hands.  In 1996, Pandeli was convicted of second degree murder for killing Humphreys and was sentenced to twenty years in prison.

¶4       Pandeli's resentencing for the Iler murder commenced in February 2006.  The State sought to prove two aggravating circumstances:  that Pandeli had been "previously convicted of a serious offense," *see* A.R.S. § 13-703(F)(2) (Supp. 1993), and that he committed the murder in an "especially heinous . . . or depraved manner," *see id.* § 13-703(F)(6).  In support of the (F)(2) aggravating factor, the State produced evidence of the Humphreys murder conviction.  To prove the (F)(6) aggravating factor, the State introduced evidence that Pandeli mutilated Iler's body and kept souvenirs of the murder.  The jury found both aggravating circumstances and rendered a verdict of death.

## II.  DISCUSSION

¶5       Pandeli raises eight issues on appeal and lists seven additional issues to avoid preclusion.  We address only those issues argued to this Court and append a list of preserved claims to this opinion.

### A.   Ability to Conduct Voir Dire

¶6       Pandeli claims that the trial court's failure to rule before trial on the scope of the State's penalty phase rebuttal

hindered his ability to conduct voir dire because he did not know whether to question jurors about their feelings regarding serial killers. Before trial, the State asked to introduce the facts of Teresa Humphreys' murder in rebuttal to Pandeli's proffered mitigation evidence to demonstrate that Pandeli should not be shown leniency. The trial court deferred ruling on the motion until after the defense presented its mitigation evidence to allow the court to assess whether the Humphreys murder evidence would be relevant.

¶7 At the oral argument on the motion, Pandeli did not argue that the court's failure to rule would hinder his ability to conduct voir dire; he first made that argument in his motion for a new trial, filed after he had been sentenced to death. Because Pandeli did not object on these grounds at trial, we review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). To satisfy the fundamental error standard, a defendant must demonstrate not only "error going to the foundation of the case," but also that the error caused him prejudice. *Id.* at ¶¶ 19-20.

¶8 We conclude that the judge's delay in ruling did not deprive Pandeli of the ability to conduct voir dire. There was no error, much less fundamental error. Despite the trial court's decision not to rule immediately on the State's motion, the defense had the opportunity to question the prospective

jurors about their feelings toward serial killers. The prospective jurors were informed that Pandeli had previously been convicted of another murder and were asked in the Jury Selection Questionnaire whether they thought the death penalty was appropriate for serial murderers. Defense counsel then had the opportunity to follow up on this issue. Several prospective jurors were questioned about their beliefs regarding serial killers.

¶9     Moreover, Pandeli has not identified any questions he wanted to ask but was denied permission to ask. And, generally, any overly specific questions would not have been allowed. A defendant does not have the right to "commit [prospective jurors] to certain positions prior to receiving the evidence." *State v. Melendez*, 121 Ariz. 1, 3, 588 P.2d 294, 296 (1978); *cf. State v. Smith*, ___ Ariz. ___, ___, ¶ 42, 159 P.3d 531, 541 (2007) (holding that a trial court need not permit a defendant to question jurors about their assessment of specific aggravating factors).

¶10     Finally, to the extent that Pandeli complains about the voir dire of prospective jurors 29, 42, and 77, those individuals were dismissed and did not sit on the jury; therefore, Pandeli cannot show any prejudice stemming from his inability to question these jurors. *See State v. Glassel*, 211 Ariz. 33, 46-47, ¶ 41, 116 P.3d 1193, 1206-07 (2005), *cert.*

*denied*, 126 S. Ct. 1576 (2006).  In sum, Pandeli has not shown that his ability to conduct voir dire was hindered by the trial court's delay in ruling or that he did not have a fair and impartial jury.

**B.  Aggravation Phase Issues**

    1.  <u>(F)(2) aggravating circumstance</u>

¶11      Pandeli next claims three separate errors with regard to the (F)(2) "serious offense" aggravating factor:  (1) The trial court improperly allowed the State to introduce the underlying facts of the Humphreys murder to prove the (F)(2) aggravating factor; (2) the trial court should not have allowed the State to present any evidence of the (F)(2) aggravating factor to the jury and instead should have told the jury that the aggravating circumstance was established; and (3) use of the Humphreys murder conviction to support the (F)(2) aggravating circumstance violated the Double Jeopardy Clause because it allowed additional punishment to stem from a prior conviction. We review evidentiary rulings of the trial court for abuse of discretion, *State v. McGill*, 213 Ariz. 147, 156, ¶ 40, 140 P.3d 930, 939 (2006), *cert. denied*, 127 S. Ct. 1914 (2007), and we review legal and constitutional issues de novo, *State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004).

    *a.  Evidence of prior conviction*

¶12      "The proper procedure to establish [a] prior

conviction is for the state to offer in evidence a certified copy of the conviction . . . and establish the defendant as the person to whom the document refers." *State v. Lee*, 114 Ariz. 101, 105, 559 P.2d 657, 661 (1976). The State followed this procedure and did not introduce any of the underlying facts of the Humphreys murder to establish the (F)(2) aggravating circumstance.[1] Thus, there was no error.

   *b. Submission of (F)(2) aggravating factor to jury*

¶13  Pandeli argues that submitting the (F)(2) aggravating factor to the jury violated his Sixth Amendment right. We disagree.

¶14  After receiving a new sentencing hearing to cure the error caused by allowing the judge to find the aggravating circumstances, Pandeli now claims that the jury should not have been allowed to find the (F)(2) aggravating factor because the Sixth Amendment to the United States Constitution does not require a jury to determine the existence of a prior conviction. *See State v. Ring (Ring III)*, 204 Ariz. 534, 556, ¶ 55, 65 P.3d 915, 937 (2003). Arizona Revised Statutes § 13-703.01(P) (Supp. 2006), however, requires a jury to make all findings of fact in a death penalty sentencing hearing, and the fact that the Sixth

---

[1] The underlying facts of the Humphreys murder were introduced in the penalty phase to rebut Pandeli's mitigation evidence. Pandeli raised the admission of this evidence as a separate issue, addressed *infra* ¶¶ 51-59.

Amendment allows a judge to find prior convictions does not affect that statutory mandate. Nothing in the Constitution requires that a judge find the prior serious offense aggravating circumstance, and the Arizona statute affirmatively requires that the finding be made by the jury. *See* A.R.S. § 13-703.01(P).

¶15 Pandeli also argues that it was unnecessary for the jury to find the existence of his prior conviction because a trial judge's finding in an earlier sentencing proceeding that a prior conviction exists may not be disturbed at resentencing. In support of this proposition, he cites *State v. Montaño*, 206 Ariz. 296, 77 P.3d 1246 (2003), and *State v. Cropper*, 206 Ariz. 153, 76 P.3d 424 (2003). The question in those cases differed from the one now before us. In *Montaño* and *Cropper*, we were analyzing whether the error in having a judge find aggravating factors was harmless. For purposes of the harmless error inquiry, we stated that we would not "disturb the trial judge's finding that the prior serious conviction aggravating circumstance exists." *Montaño*, 206 Ariz. at 299, ¶ 12, 77 P.3d at 1249; *Cropper*, 206 Ariz. at 155, ¶ 9, 76 P.3d at 426. This language did not establish the existence of the (F)(2) aggravating circumstance as a matter of law because we vacated the death sentences and remanded the cases for resentencing. *Montaño*, 206 Ariz. at 301, ¶ 26, 77 P.3d at 1251; *Cropper*, 206

- 8 -

Ariz. at 158, ¶ 24, 76 P.3d at 429. Because Pandeli's death sentence was vacated, the State was obligated to re-prove the (F)(2) aggravating circumstance on resentencing. Arizona Revised Statutes § 13-703.01(P) requires that the finding be made by a jury.

### c. Double jeopardy violation

¶16 Finally, Pandeli argues that the use of the Humphreys murder conviction to establish the (F)(2) aggravating factor violated double jeopardy by allowing additional punishment for a prior crime. We have previously held that using a prior conviction under a recidivist statute to enhance a sentence on a new and separate charge does not violate double jeopardy. *State v. Mauro*, 159 Ariz. 186, 209, 766 P.2d 59, 82 (1988). The (F)(2) aggravating factor is a recidivist provision. *See Ring III*, 204 Ariz. at 558, ¶ 66, 65 P.3d at 939. Therefore, use of the Humphreys murder conviction to prove the (F)(2) factor did not violate double jeopardy.

### 2. Constitutionality of (F)(6) aggravating circumstance

¶17 Pandeli asserts that the (F)(6) "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague and overbroad. He makes three separate arguments in support of his assertion: (1) This Court has failed to sufficiently define the factor through specific and consistent guidelines; (2) *Walton v. Arizona*, 497 U.S. 639

- 9 -

(1990),[2] no longer saves the (F)(6) factor from unconstitutional vagueness because juries, rather than judges, now find aggravating circumstances; and (3) the jury instruction in this case failed to cure the facial vagueness of the statutory language because it used terms that are equally vague. The Court reviews alleged constitutional violations de novo. *McGill*, 213 Ariz. at 159, ¶ 53, 140 P.3d at 942.

> a.   *Failure to sufficiently define the (F)(6) factor*

**¶18**      In *Walton v. Arizona*, the Supreme Court of the United States held that Arizona's (F)(6) statutory aggravating circumstance is facially vague. 497 U.S. at 654. That Court ultimately held, however, that the (F)(6) aggravating circumstance is constitutional because Arizona judicial opinions have provided a narrowing construction that "gives meaningful guidance to the sentencer." *Id.* at 653–55. Pandeli's first argument thus does not provide a basis for reversal.

> b.   *Jury sentencing renders instruction vague as applied*

**¶19**      Pandeli argues that *Walton* does not save the (F)(6) factor from unconstitutional vagueness because juries, rather than trial judges, now find the existence of aggravating circumstances. We have rejected this argument several times.

---

[2]   *Walton* was overruled on other grounds by *Ring II*, 536 U.S. at 609.

*State v. Cromwell*, 211 Ariz. 181, 188-89, ¶¶ 40-42, 119 P.3d 448, 455-56 (2005), *cert. denied*, 126 S. Ct. 2291 (2006); *State v. Anderson (Anderson II)*, 210 Ariz. 327, 352-53, ¶¶ 109-14, 111 P.3d 369, 394-95 (2005). *Cromwell* and *Anderson* "hold that the (F)(6) aggravator may be constitutionally applied if given substance and specificity by jury instructions that follow this Court's constructions." *State v. Hampton*, 213 Ariz. 167, 176, ¶ 36, 140 P.3d 950, 959 (2006), *cert. denied*, 127 S. Ct. 972 (2007). We next address the adequacy of the instructions given in Pandeli's case.

### c. Sufficiency of the jury instructions

¶20 Pandeli argues that the jury instructions given at his sentencing did not sufficiently define "heinous" and "depraved" because those words were defined by equally vague terms. We disagree. The terms heinous and depraved were properly defined using terms that were themselves clearly defined. The instructions stated, in relevant part:

> The terms "heinous" or "depraved" focus upon a defendant's state of mind at the time of the offense, as reflected by his words and actions at or near the time of the offense. A murder is especially heinous if it is hatefully or shockingly evil: grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion or deterioration. To determine whether Defendant's actions were especially heinous or depraved, you should consider whether Defendant's behavior evidenced any of the following:
>
> 1. Relishing the murder; or

- 11 -

2.   Inflicting gratuitous violence on the victim beyond that necessary to kill; or

3.   Mutilating the victim's body.

In this context, "relishing" refers to Defendant's words or actions that demonstrate debasement or perversion. In order to support a finding of relishing, Defendant must say or do something, other than committing the murder itself, to show that he savored or reveled in the killing.

In this context, "gratuitous violence" refers to violence committed upon the victim beyond that necessary to kill. Gratuitous violence also may be found if you determine that the circumstances evidence that the murder could have been accomplished by less violent manners.

In this context, "needless mutilation" means that Defendant, in any act separate and distinct from the killing itself, committed other acts with the intent to mutilate the victim's corpse, such as the purposeful severing of body parts.

¶21    We conclude that the terms "heinous" and "depraved" were defined using easily understood terms or terms that were themselves defined. Moreover, the instructions are virtually identical to the ones we approved in *Anderson II*, 210 Ariz. at 352-53 n.19, ¶ 111, 111 P.3d at 394-95 n.19. The only significant difference between the two instructions is that the *Anderson II* instructions included a paragraph explaining that certain statements by a defendant cannot be considered relishing. *Id*. It was unnecessary to provide a similar instruction in this case, however, because the State did not allege that Pandeli made any statements that demonstrated

relishing.  The jury instructions in this case properly narrowed and defined the (F)(6) aggravating factor.

   3.  Photographs admitted to prove (F)(6) aggravating circumstance

¶22     Pandeli next contends that the trial court erred when it admitted photographs of Holly Iler's body, photographs of a Confederate flag found in Pandeli's van, and a photograph of his body that showed his tattoos.  We review a trial court's rulings on the admissibility of photographic evidence for abuse of discretion.  *McGill*, 213 Ariz. at 154, ¶ 30, 140 P.3d at 937.

¶23     Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.   Ariz.  R.  Evid.  403.   When assessing the admissibility of photographs, we "consider the photographs' relevance, the likelihood that the photographs will incite the jurors' passions, and the photographs' probative value compared to their prejudicial impact."  *McGill*, 213 Ariz. at 154, ¶ 30, 140 P.3d at 937 (citing *State v. Davolt*, 207 Ariz. 191, 208, ¶ 60, 84 P.3d 456, 473 (2004)).   Because "[t]here is nothing sanitary about murder," nothing "requires a trial judge to make it so."  *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997).  Photographs, however, cannot be introduced "for the sole purpose of inflaming the jury."  *State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982).

### a. *Photographs of Iler's body*

¶24 Pandeli specifically objects to the admission of exhibits 40, 44, 100, 102, 103, and 105 because they were "gruesome and inflammatory." The State introduced the photographs to support testimony establishing the "heinous" and "depraved" prongs of the (F)(6) aggravating factor. The six contested photographs depict the victim's body at the scene of the crime as well as during the autopsy. They illustrate all of her wounds including the bruising to her face, her nipple excision wounds, and her slashed throat. All of the contested photographs are relevant. *See Hampton*, 213 Ariz. at 173, ¶ 20, 140 P.3d at 956 (finding photographs relevant that showed "the nature and the placement of the victim['s] injuries").

¶25 Pandeli argues, however, that the photographs were irrelevant and introduced to inflame the passions of the jury because the defense did not contest, and indeed had offered to stipulate to, the facts of the murder. On this issue, we have stated that "[e]ven if a defendant does not contest certain issues, photographs are still admissible if relevant because the burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996) (internal quotation marks omitted). Moreover, in this case, while Pandeli was willing to stipulate

to having killed Iler, he did not offer to stipulate that the murder was heinous and depraved. The State thus still had to prove this aggravating circumstance.

¶26      In addition to being relevant, the photographs are not unduly prejudicial. Only one photograph, exhibit 40, is gruesome. It shows the victim's face, neck, and breasts, covered with blood, dirt, and other debris. The trial judge, however, carefully considered whether to admit exhibit 40 and did not admit similar photographs of the victim that were more gruesome. Although the judge acknowledged its gruesomeness, he nonetheless found the probative value of exhibit 40 not outweighed by unfair prejudice. We hold that the trial court did not abuse its discretion in admitting the photographs of Iler's body.

       b.   *Photographs of tattoos and Confederate flag*

¶27      Pandeli asserts that exhibits 59, 64, and 65 were irrelevant and prejudicial, and therefore were improperly admitted. These photographs, like the photographs of Iler's body, were admitted to prove the (F)(6) aggravating circumstance. Exhibit 65 depicts the side of Pandeli's van and shows that he used a Confederate flag as a window covering. Exhibit 59 is a close-up photograph of the Confederate flag that shows some blood spatter. Exhibit 64 shows Pandeli standing shirtless, shortly after his arrest. It reveals tattoos on his

- 15 -

upper arms and the upperleft side of his chest. The photograph was taken from a distance so the viewer cannot discern what the tattoos depict.

¶28      The photographs of the Confederate flag are relevant. Exhibit 59 shows the victim's blood on the flag, and exhibit 65 shows the van in which the murder took place. The photograph of Pandeli is also relevant because it depicts Pandeli's physical condition at the time of the murder and shows no visible injuries or defensive wounds resulting from the crime. Although relevant, the photographs had minimal probative value. Pandeli had already stipulated to the existence of blood on the flag, and the facts that the murder took place in the van and the absence of injuries to Pandeli were not contested.

¶29      The photographs, however, are also minimally prejudicial. The Confederate flag photographs had little prejudicial impact because the defense stipulated to the existence of blood on the "Confederate flag taken from the rear side window" of Pandeli's van. We find it unlikely that the photographs of the flag prejudiced the jury any more than the stipulation. *Cf. McGill*, 213 Ariz. at 155, ¶ 32, 140 P.3d at 938 ("We consider it unlikely that the pictures added much to any sense of shock the jurors experienced from hearing the injuries described."). The photograph of Pandeli was also minimally prejudicial because his tattoos cannot be discerned

- 16 -

and the mere presence of tattoos is not shocking or prejudice-inducing. Therefore, although the photographs had little probative value, the court did not abuse its discretion in admitting them. *See State v. Cañez*, 202 Ariz. 133, 154, ¶ 67, 42 P.3d 564, 585 (2002) (finding no abuse of discretion in admitting evidence that was both minimally probative and minimally prejudicial).

## C. Penalty Phase Issues

### 1. State prevented jury from considering mitigation evidence

¶30 Pandeli claims that the State improperly limited the type of mitigation the jury could consider by arguing in closing that (1) there was no causal nexus between the mitigating evidence and the crime, and (2) Pandeli knew right from wrong. When an objection was made, we review a trial court's ruling on the scope of closing argument for abuse of discretion. *See State v. Roque*, 213 Ariz. 193, 223, ¶ 123, 141 P.3d 368, 398 (2006).

#### a. *Mitigating evidence has no causal nexus to crime*

¶31 Pandeli claims that the State improperly suggested in closing argument that the jurors could not find mitigation in the absence of a causal nexus between the mitigating evidence and the crime, in violation of *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (holding that jurors cannot be prevented from giving

effect to mitigating evidence solely because the evidence is not causally connected to the crime). He specifically complains about the following statements: "[W]e're not here to focus on defendant's childhood. . . . [Y]ou look at the last few years of his life, that's what we judge it on," and "The natural rain and facts of this case wash[] mitigation away."

¶32 We addressed, and rejected, this precise claim in *Anderson II*, stating:

> Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight. The prosecutor's various comments and questions here simply went to the weight of Anderson's mitigation evidence and were not improper.

210 Ariz. at 350, ¶ 97, 111 P.3d at 392. Similarly, in this case the State never told jurors that they could not consider mitigation unrelated to the crime; it merely suggested that such mitigation was entitled to minimal weight.

¶33 Furthermore, any potential error was cured by the jury instructions, which informed the jurors that they should consider and give effect to all of Pandeli's mitigation evidence. The court specifically instructed the jurors that "[t]he defendant need not prove that the mitigating circumstances were the direct cause of the offense." The court also told the jurors to "consider and give effect to all

- 18 -

mitigating circumstances that have been raised by any aspect of the evidence." These instructions remedied any potential error. *See Roque*, 213 Ariz. at 223-24, ¶ 126, 141 P.3d at 398-99 (holding that jury instructions that required jurors to consider "anything" as mitigation and enumerated specific mitigating factors, including those that lacked a causal nexus to the crime, cured any potential error).

### b. *Pandeli knew right from wrong*

¶34 In *Eddings v. Oklahoma*, the Supreme Court of the United States held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." 455 U.S. 104, 113-14 (1982). Thus, the State may not tell jurors that they cannot consider relevant mitigating evidence.

¶35 Pandeli asserts that the State did just that when it argued in its closing that Pandeli knew the difference between right and wrong and that the jurors should put Pandeli's background and actions "in perspective." The State, however, did not direct the jurors to disregard the mitigation evidence; it simply suggested that jurors should assign less weight to the mental health mitigation presented by Pandeli's expert witnesses. Such argument is proper. *See Anderson II*, 210 Ariz. at 350, ¶ 97, 111 P.3d at 392; *cf. State v. Johnson*, 212 Ariz.

425, 440, ¶ 65, 133 P.3d 735, 750 (affording evidence of defendant's mental impairment "minimal value" because defendant knew right from wrong), *cert. denied*, 127 S. Ct. 559 (2006).

¶36     Moreover, any potential error was remedied by the jury instructions.  *See Roque*, 213 Ariz. at 223-24, ¶ 126, 141 P.3d at 398-99.   The penalty phase jury instructions stated that "[i]n order to prove the existence of a mitigating circumstance, the defendant does not need to prove that he did not understand the nature of his actions, was unable to control his actions, or did not know his actions were wrong."  The court also instructed the jury that "[m]itigating circumstances are not a defense, excuse or justification for the offense."  Consequently, the trial court did not err when it allowed the State to argue that Pandeli knew the difference between right and wrong.

¶37     Pandeli also claims that the State's argument that Pandeli knew right from wrong was irrelevant.   We have previously held, however, that a defendant's knowledge of right and wrong decreases the weight given to mental health mitigation.  *Johnson*, 212 Ariz. at 440, ¶ 65, 133 P.3d at 750. Thus, the State's argument was relevant to the jury's assessment of the value of Pandeli's mental health mitigation.

     2.   Presumption of death in jury instructions

¶38     Pandeli next asserts that the penalty phase jury instructions were improper because they placed on him the burden

- 20 -

of proving that the mitigation was sufficiently substantial to call for leniency.  We review de novo whether jury instructions given by the trial court correctly state the law and are constitutional.  *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 471, ¶ 8, 123 P.3d 662, 665 (2005).

¶39    The trial court issued the following instructions regarding the consideration of mitigating circumstances:

> The Defendant bears the burden of proving the existence of any mitigating circumstance by a preponderance of the evidence.  That is, although the Defendant need not prove its existence beyond a reasonable doubt, the Defendant must convince you by the evidence presented that it is more probably true than not true that such a mitigating circumstance exists.  Proof by a preponderance of the evidence is a lower burden than proof beyond a reasonable doubt.

> You individually determine whether mitigation exists.  Considering the aggravating circumstances you have found, you must then individually determine if the total of the mitigation is sufficiently substantial to call for leniency.  "Sufficiently substantial to call for leniency" means that mitigation must be of such quality or value that it is adequate, in the opinion of an individual juror, to persuade that juror to vote for a sentence of life in prison.

> Even if a juror believes that the aggravating and mitigating circumstances are of the same quality or value, that juror is not required to vote for a sentence of death and may instead vote for a sentence of life in prison.  A juror may find mitigation and impose a life sentence even if the Defendant does not present any mitigation evidence.

¶40    Nothing in the instructions suggests that the Defendant bears the burden of proving that the mitigation is

sufficiently substantial to call for leniency; to the contrary, the instructions state that a juror in equipoise regarding mitigating and aggravating circumstances is not required to vote for death. The instructions make it clear that the sentencing decision is not a "fact question" and that it must be "based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist." *Id.* at 473, ¶ 21, 123 P.3d at 667. Moreover, the instructions did not use the "outweighing" language this Court has discouraged. *Id.* The instructions do not create a presumption of death or place an improper burden on the defendant.

### 3. Scope of rebuttal

**¶41** Pandeli argues that the trial court erred by allowing the State to introduce irrelevant and prejudicial "dump-truck aggravation" in rebuttal to the defense mitigation case.[3] We review for abuse of discretion evidentiary rulings to which an objection was made. *McGill*, 213 Ariz. at 156, ¶ 40, 140 P.3d at 939.

**¶42** The penalty phase relevance analysis differs from a normal relevance analysis because the Rules of Evidence do not

---

[3] We have previously rejected the "dump-truck aggravation" argument; jurors may consider additional evidence presented in the penalty phase that bears on whether the defendant should be shown leniency. *Hampton*, 213 Ariz. at 178 n.10, ¶ 46, 140 P.3d at 961 n.10 (quoting *Zant v. Stephens*, 462 U.S. 862, 878 (1983)).

apply in the penalty phase of a capital case.  A.R.S. § 13-703(C) (Supp. 2006).  Instead, A.R.S. § 13-703.01(G) sets forth the scope of rebuttal evidence:  "[T]he state may present any evidence that demonstrates that the defendant should not be shown leniency."

¶43     The Due Process Clause of the Fourteenth Amendment, however, places limitations on rebuttal evidence.  *Hampton*, 213 Ariz. at 179, ¶ 48, 140 P.3d at 962 (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (holding that unfairly prejudicial evidence may be excluded if it renders the proceeding "fundamentally unfair")).  We have therefore cautioned trial courts to exercise discretion in admitting penalty phase evidence:

> Trial courts can and should exclude evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial.  Nothing in our death penalty statutes strips courts of their authority to exclude evidence in the penalty phase if any probative value is substantially outweighed by the prejudicial nature of the evidence.  Trial courts should not allow the penalty phase to devolve into a limitless and standardless assault on the defendant's character and history.  Rather, trial judges should exercise their broad discretion in evaluating the relevance of such bad acts evidence to any mitigation evidence offered.

*Id.* at 180, ¶ 51, 140 P.3d at 963 (citing *McGill*, 213 Ariz. at 156-57, ¶ 40, 140 P.3d at 939-40).  A judge's analysis in determining the relevance of rebuttal evidence involves fundamentally the same considerations as relevance and prejudice

determinations under Arizona Rules of Evidence 401 and 403. *McGill*, 213 Ariz. at 157, ¶ 40, 140 P.3d at 940.

> a. *Violent sex and fantasies*

**¶44** Pandeli argues that the trial court abused its discretion by admitting the testimony of two of his former girlfriends. Because he did not object below, we review for fundamental error. *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. Pandeli must show "error going to the foundation of the case" and resulting prejudice. *Id.* at ¶¶ 19-20.

**¶45** Both women testified about Pandeli's aggressive sexual behavior and violent fantasies. The State offered the evidence to rebut testimony by Pandeli's mental health experts that he was impulsive as a result of mental impairment. Pandeli's former girlfriends' testimony rebutted his mental health mitigation because it tended to show that the murders were not committed impulsively, but were instead part of a pattern of escalating sexual violence.

**¶46** Pandeli also introduced extensive testimony of his good behavior in prison and his lack of future dangerousness. The testimony of the girlfriends rebutted Pandeli's future dangerousness mitigation and tended to show that he should not be shown leniency.

**¶47** We conclude that the evidence was relevant and that the prejudicial impact of the description of Pandeli's sexual

behavior and violent fantasies did not outweigh the probative value of the evidence.  There was no fundamental error.

### b.  *Child molestation*

¶48    Pandeli also claims that the trial court improperly allowed one former girlfriend to testify that Pandeli molested her daughter.  Pandeli's counsel argued that this evidence was admissible; therefore, we must review for fundamental error. *Id.* at ¶ 19, 115 P.3d at 607.

¶49    The witness testified that one night, when Pandeli was drunk, he crawled into her four-year-old daughter's bed and molested her.  She also testified about the impact of that abuse on her daughter's life.  This testimony was damaging.

¶50    We conclude that there was no reversible error, however, because Pandeli invited the error.  At trial, the court asked whether Pandeli's counsel objected to the child molestation testimony and he explicitly stated that he did not. He agreed that the testimony was admissible "other act" evidence.  "This court has long held that 'a defendant who invited error at trial may not then assign the same as error on appeal.'"  *Moody*, 208 Ariz. at 453, ¶ 111, 94 P.3d at 1148 (quoting *State v. Endreson*, 109 Ariz. 117, 122, 506 P.2d 248, 253 (1973)).  Pandeli therefore may not assert error on this point on appeal.

### c. Humphreys murder testimony

¶51     Pandeli next argues that the trial court abused its discretion when it allowed the State to introduce the underlying facts of the Humphreys murder, because such evidence was irrelevant, prejudicial, and cumulative.  Evidence regarding the Humphreys murder was presented through the testimony of Dr. Keen, the county medical examiner, and Detectives Gregory and Rea, to demonstrate that Pandeli did not deserve to be shown leniency.

¶52     All of the testimony presented by the State was relevant.  The facts of Humphreys' brutal murder demonstrated that Pandeli was not entitled to leniency.  *See* A.R.S. § 13-703.01(G).  Furthermore, the fact that Pandeli murdered two women in a similar, savage fashion rebutted his mental health mitigation by tending to show that he did not act impulsively.  Moreover, one of Pandeli's experts, Dr. Cunningham, relied on the facts of the Humphreys murder to support his opinion of Pandeli's mental health.  *Cf. Johnson*, 212 Ariz. at 435-36, ¶¶ 36-40, 133 P.3d at 745-46 (holding that trial court did not abuse its discretion in allowing into evidence videotape that assisted jury in determining the credibility and accuracy of an expert's diagnosis).  Finally, none of the evidence was cumulative because each witness provided different information about the murder.

¶53          The fact that the evidence was relevant does not end our analysis; we must also determine whether the evidence was unfairly prejudicial.  *Smith*, ___ Ariz. at ___, ¶ 54, 159 P.3d at 542 (citing *Hampton*, 213 Ariz. at 179, ¶ 48, 140 P.3d at 962).  Although damaging to Pandeli, none of the testimony was unduly prejudicial.  The witnesses simply provided details of the crime scene and described Humphreys' injuries.  The trial court therefore did not abuse its discretion in admitting this testimony.

#### d.    *Humphreys murder photographs*

¶54          Pandeli argues that photographs relating to the Humphreys murder were improperly admitted because he did not contest any of the facts of the murder, and thus the photographs were irrelevant and unduly prejudicial.[4]  Pandeli objects to exhibits 218-246, 248-250, and several photographs that were never admitted into evidence.  We do not address the photographs that were not admitted.  The photographs that were admitted into evidence show where Humphreys' body was found, her body at the crime scene, the severe defensive wounds to her hands, her slit throat, a moon-shaped knife wound on her chest, a different wound on her chest, wounds on her back, and a photograph of the folder in which the photographs were kept by the police.

---

[4]    This argument mirrors the argument regarding the Iler photographs, addressed *supra* ¶¶ 24-26.

¶55    The photographs shown to the jury were relevant to corroborate the testimony of the detectives and the medical examiner concerning the Humphreys murder. *See Hampton*, 213 Ariz. at 173, ¶ 20, 140 P.3d at 956 (stating that photos demonstrating "the nature and the placement of the victims' injuries" were "relevant to corroborate the testimony of the State's witnesses").    They were also relevant because they rebutted Pandeli's mitigation evidence.  The photographs allowed the jury to see the similarities between the two murders, and they assisted the jurors in deciding whether Pandeli was entitled to a sentence more lenient than death.  Additionally, they tended to show that Pandeli did not commit the Iler murder impulsively and that he might pose a future danger to others if not sentenced to death.

¶56    The photographs were not so prejudicial as to render Pandeli's trial fundamentally unfair.  Exhibits 218-219, 232-234, and 246 do not show Humphreys' body.  And although the photos of Humphreys' body are somewhat gruesome, the jurors likely were not unduly shocked in light of the detectives' and medical examiner's testimony regarding Humphreys' injuries and the fact that the jurors had seen the photographs of Holly Iler's body during the aggravation phase. *See McGill*, 213 Ariz. at 155, ¶ 32, 140 P.3d at 938.  Moreover, the trial court carefully examined the photographs and excluded photos that were

cumulative or unduly prejudicial.  The trial court did not abuse its discretion in admitting the Humphreys murder photographs.

### e.  *Lavora Humphreys' testimony*

¶57    Pandeli also claims that the trial court abused its discretion when it allowed Lavora Humphreys, Teresa Humphreys' sister, to testify because her testimony was cumulative, irrelevant, and improper "victim impact" testimony.  Lavora Humphreys testified about the clothing Teresa was wearing the last time Lavora saw her, that Teresa never carried a knife, that she did not know how to drive, and that she had no major injuries before she was killed.  Lavora also described the position of Teresa's body at the crime scene and stated that "we didn't want Teresa to leave and she left, and a couple occurrences happened before she was walking out the door."

¶58    With the exception of the statement that she "didn't want [Teresa] to leave," none of Lavora's testimony was "victim impact" testimony.  The single improper statement was interrupted by defense counsel's objection, and Lavora was not allowed to describe the "occurrences" that she mentioned.  Lavora's testimony was also not cumulative because the information she provided was not previously given by Detectives Gregory or Rea or by Dr. Keen.  Her testimony was, however, mostly irrelevant and did not provide any important facts of the crime.

¶59     Although minimally probative, the trial court did not abuse its discretion in admitting Lavora's testimony because it was also minimally prejudicial.  *See Cañez*, 202 Ariz. at 154, ¶ 67, 42 P.3d at 585 (finding no abuse of discretion where evidence was both minimally probative and minimally prejudicial).  We conclude that there was no error with regard to Lavora Humphreys' testimony.

            *f.    "Battered Relationships" pamphlet*

¶60     Pandeli also argues that the trial court abused its discretion by allowing the State to admit a pamphlet entitled "Battered Relationships."  This document, however, was neither admitted into evidence nor discussed in front of the jury.  Consequently, no error occurred.

**D.    Severability of Death Penalty Statute**

¶61     Pandeli asserts that the portion of the death penalty statute struck down in *Ring II* is not severable from the rest of the statute, rendering the whole statute unconstitutional.  Therefore, he argues, he should be sentenced to life in prison in accordance with a provision of Arizona law that provides as follows:

> In the event the death penalty is held to be unconstitutional on final appeal, a person convicted of first degree murder or another offense punishable by death who has been sentenced to die shall be resentenced by the sentencing court to life imprisonment without possibility of parole until the person has served a minimum of twenty-five calendar

years.

1973 Ariz. Sess. Laws, ch. 138, § 10.  We review constitutional questions and questions of statutory interpretation de novo. *Roque*, 213 Ariz. at 217, ¶ 89, 141 P.3d at 392.

¶62      In *State v. Watson*, this Court explained that "[s]everability is a question of legislative intent."  120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978).  We noted that the test is whether

> the legislature would have enacted [the statute without the unconstitutional portion], if it had known of the invalidity, or, as otherwise stated, if the valid or invalid parts are not so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other.

*Id.* (quoting *Millett v. Frohmiller*, 66 Ariz. 339, 342-43, 188 P.2d 457, 460 (1948)).  "[I]f part of an act is unconstitutional and by eliminating the unconstitutional portion the balance of the act is workable, only that part which is objectionable will be eliminated and the balance left intact."  *Id.* at 452, 568 P.2d at 1264 (quoting *State v. Coursey*, 71 Ariz. 227, 236, 225 P.2d 713, 719 (1950)).

¶63      Applying these tests to the death penalty statute, we conclude that the portion of the statute struck down in *Ring II*, which allowed a judge to find aggravating circumstances, is not so intimately connected to the rest of the statute as to raise the presumption that the legislature would not have enacted the

statute without it.  We doubt that the legislature enacted the death penalty statute contingent upon judges serving as the fact-finders for aggravating circumstances.  Furthermore, the statute, shorn of the unconstitutional provision, is still workable.

¶64     We came to a similar conclusion in *Watson*.  In that case, the issue before the Court was whether the portion of the death penalty statute limiting the type of mitigation evidence a defendant could present was severable from the rest of the statute.  *Id.* at 445, 586 P.2d at 1257.  After noting that "[d]efendants in Arizona have always had the right to present any evidence in mitigation at the time of sentencing," we held that "[w]e can presume that had the legislature been aware of the unconstitutionality of the limitation on mitigating circumstances, they [sic] would have enacted the remainder of the statute without what is now the offending portion."  *Id.*

¶65     The right to trial by jury in criminal cases is enshrined in two provisions of the Arizona Constitution,[5] as well as the Sixth Amendment of the United States Constitution.  It is reasonable to presume that had the legislature known that

---

[5]     Article 2, Section 23, states:  "The right of trial by jury shall remain inviolate."  Article 2, Section 24, states:  "In criminal prosecutions, the accused shall have the right to . . . a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed . . . ."

juries, not judges, had to find aggravating factors, it would nonetheless have enacted the statute without the portion struck down in *Ring II*. Moreover, the legislature's decision to have the death penalty is not inextricably intertwined with the identity of the fact-finder for aggravating circumstances. Because the portion of the death penalty statute struck down in *Ring II* was severable, the unoffending portions remained effective, and the provision requiring automatic conversion of a death sentence to a life sentence does not apply. *See* 1973 Ariz. Sess. Laws, ch. 138, § 10.

¶66     Pandeli urges us to follow *Woldt v. People*, 64 P.3d 256 (Colo. 2003). In that case, decided after *Ring II*, the Colorado Supreme Court held that Colorado's death row inmates should be resentenced to life imprisonment based on a Colorado provision requiring those sentenced to death under an unconstitutional statute to be resentenced to life in prison. *Id.* at 267 (citing Colo. Rev. Stat. § 18-1.3-401(5) (2002)). Because the Colorado Supreme Court did not engage in a severability analysis, however, its decision is not helpful.

¶67     In sum, the provision of Arizona's former death penalty statute struck down in *Ring II* was severable from the rest of the statute. Thus, *Ring II* did not render A.R.S. § 13-703 unconstitutional.

**E.   Independent Review**

¶68       Because the Iler murder occurred before August 1, 2002, we must independently review the aggravating and mitigating circumstances and the propriety of the death sentence.  A.R.S. § 13-703.04(A) (Supp. 2006); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7.  In conducting our analysis, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *Roque*, 213 Ariz. at 230, ¶ 166, 141 P.3d at 405 (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

        1.   Aggravating circumstances

¶69       We conclude, based on our independent review of the record, that the State proved both aggravating factors found by the jury beyond a reasonable doubt.  The State proved the (F)(2) factor by introducing Pandeli's conviction for the second degree murder of Teresa Humphreys, *see* A.R.S. § 13-703(H)(2) (Supp. 1993) (listing second degree murder as a serious offense), and by establishing that he was the person convicted.  The State also proved the (F)(6) aggravating factor by demonstrating that Pandeli mutilated Iler's body and relished the murder by taking souvenirs.

        2.   Mitigating circumstances

¶70       Pandeli presented evidence of five general types of mitigation in the penalty phase.  He first presented evidence of

- 34 -

his difficult childhood and family life, including physical and sexual abuse. Pandeli's father was physically abusive and left the family when Pandeli was approximately two years old. Following the divorce, Pandeli's mother provided little stability, structure, or supervision to Pandeli or his siblings.

¶71    In addition to general neglect and minor physical abuse, Pandeli was extensively sexually abused throughout his youth. He was first abused by a family friend when he was approximately five or six years old. He was also repeatedly sexually abused by at least four other men, including his uncle and a convicted child molester. Dr. Cunningham, a defense expert, characterized Pandeli's sexual abuse as "extensive [and] pervasive" and "as severe a case as I have ever seen."

¶72    We find that Pandeli has proven by a preponderance of the evidence that he had a dysfunctional childhood and was emotionally neglected, physically abused, and extensively sexually abused. But "a 'difficult family background, in and of itself, is not a mitigating circumstance' sufficient to mandate leniency in every capital case." *Hampton*, 213 Ariz. at 185, ¶ 89, 140 P.3d at 968 (quoting *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989)). Although "[w]e do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence . . . the failure to establish such a causal connection may be considered

in assessing the quality and strength of the mitigation evidence." *State v. Newell*, 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833, 849, *cert. denied*, 127 S. Ct. 663 (2006). Pandeli's difficult childhood and extensive sexual abuse, while compelling, are not causally connected to the crime. Moreover, Pandeli murdered Iler when he was in his late twenties, reducing the relevance of his traumatic childhood. *See Hampton*, 213 Ariz. at 185, ¶ 89, 140 P.3d at 968. We do not give this mitigating evidence significant weight.

¶73 The second type of mitigation Pandeli presented was that he began abusing drugs and alcohol when he was extremely young, in conjunction with his sexual abuse. The substance abuse continued throughout his childhood and into adulthood, when he began using cocaine and acid. Pandeli proved by a preponderance of the evidence that he was a drug and alcohol abuser.

¶74 Pandeli attempted to tie his substance abuse to the crime in two ways. First, he attempted to prove that he was intoxicated on the night of the murder. Dr. Cunningham testified that Pandeli told him that when the Iler murder took place, Pandeli was intoxicated as a result of using alcohol and methamphetamine. Pandeli's friends who were with him on the night of the murder, however, contradicted this assertion. Pandeli failed to demonstrate by a preponderance of the evidence

that he was intoxicated on the night of the murder.

¶75      Dr. Cunningham and Dr. Walter, a neuropsychologist, also attempted to tie Pandeli's drug use to the murder by arguing that it changed the way his brain functioned.  Pandeli did not, however, "provide[] any specific evidence that his brain [functioning] was actually altered by his past alcohol and drug abuse so as to cause or contribute to his participation in the murder[]."  *State v. Ellison*, 213 Ariz. 116, 145, ¶ 139, 140 P.3d 899, 928, *cert. denied*, 127 S. Ct. 506 (2006).  Because he failed to tie his alcohol and drug abuse to the crime or to his mental functioning on the night of the murder, we give this mitigating evidence minimal weight.  *See Newell*, 212 Ariz. at 405, ¶ 82, 132 P.3d at 849.

¶76      The third type of mitigating evidence Pandeli presented was of his mental impairment and learning disabilities.  Pandeli exhibited symptoms of a severe form of Attention Deficit Hyperactivity Disorder ("ADHD") when he was young and it was suggested that there was a neurological basis for his impairment.  Pandeli participated in special education classes from second grade until he quit school at age sixteen.

¶77      In addition to his learning disabilities and neurological impairment, Pandeli also suffered from depression. He first attempted to commit suicide in the third grade and attempted to commit suicide twice more as an adult.  Pandeli

also had a family history of learning disabilities and depression.

¶78     The experts who testified in the penalty phase all agreed that Pandeli suffered some mental impairment. Dr. Walter diagnosed Pandeli as having "cognitive disorder not otherwise specified" due to impairment in his frontal lobe and temporal lobe, and testified that less than five percent of the population is as impaired as Pandeli. Dr. Cunningham testified that Pandeli's impairments and experiences affected the choices available to him. Dr. Bayless, the State's expert, testified that Pandeli suffered from depression and diagnosed him as having depressive disorder not otherwise specified, learning disorder not otherwise specified, and antisocial personality disorder. Pandeli established by a preponderance of the evidence that he suffered from some mental impairment.

¶79     Pandeli attempted to tie his mental impairment to the crime. Dr. Walter testified that frontal lobe impairment makes a person act impulsively, can cause violence, and could have led to the murder of Iler. Similarly, Dr. Cunningham testified that the murders of both Humphreys and Iler were disorganized, demonstrating that Pandeli's impairment may have played a role in them. Dr. Walter, however, conceded that Pandeli was capable of learning from past mistakes, and Dr. Cunningham admitted that Pandeli had the ability to make choices and conform to the law.

Dr. Bayless testified that Pandeli knew the difference between right and wrong.

¶80     Moreover, the State introduced evidence demonstrating that Pandeli was not significantly hampered by his mental impairment.    Pandeli's videotaped confession shows him responding very carefully to the detectives' questions and lying to avoid responsibility.    Pandeli does not have mental retardation.    His IQ of approximately 90 is average to low average and two defense witnesses characterized him as "street smart."

¶81     Pandeli has not established a nexus between his impairment and the crime, nor has he proved that he was impaired to such a degree as to interfere with his ability to know the difference between right and wrong or conform his conduct to the law.    We consider mental impairment mitigation in proportion "to a defendant's ability to conform or appreciate the wrongfulness of his conduct."    *State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997); *see also Johnson*, 212 Ariz. at 440, ¶ 65, 133 P.3d at 750.    Because Pandeli knew right from wrong, was not significantly impaired, and did not demonstrate a causal nexus between his mental impairments and the murder, we afford his mental health mitigation minimal weight.

¶82     The fourth type of mitigation Pandeli presented was that he behaved well in prison.    He proved by a preponderance of

the evidence that he behaved well in prison and posed little risk of future dangerousness while incarcerated. We give this mitigating circumstance little weight, however, because prisoners are expected to behave and adapt to prison life. *State v. Harrod*, 200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

**¶83** Finally, Pandeli presented evidence that he could develop and maintain positive relationships. While he proved this mitigating circumstance by a preponderance of the evidence, this circumstance carries little weight. *E.g.*, *Cañez*, 202 Ariz. at 164, ¶ 120, 42 P.3d at 595.

### 3. Propriety of death sentence

**¶84** The mitigation evidence presented by Pandeli is not insubstantial. His history of neglect, sexual abuse, substance abuse, and mental health problems demonstrates that he was an extremely damaged individual. The aggravating circumstances proved by the State, however, are also substantial, especially the fact that Pandeli had previously been convicted of another murder. *Cf. Hampton*, 213 Ariz. at 185, ¶ 90, 140 P.3d at 968 (giving "extraordinary weight" to (F)(8) multiple murders aggravating circumstance). In light of the prior murder of Humphreys and the brutality of the Iler murder, the mitigation evidence presented by Pandeli is not sufficiently substantial to call for leniency.

### III. CONCLUSION

¶85      For the foregoing reasons, we affirm Pandeli's death sentence.

_____
Rebecca White Berch, Vice Chief Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


_____
Patricia K. Norris, Judge*


*Justice Andrew D. Hurwitz recused himself from this case. Pursuant to Article 6, Section 3, of the Arizona Constitution, the Honorable Patricia K. Norris, Judge of the Arizona Court Appeals, Division One, was designated to sit in this matter.

**Appendix**

Pandeli raises the following seven challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1.  The death penalty is per se cruel and unusual punishment. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and by this Court in *Harrod*, 200 Ariz. at 320, ¶ 59, 26 P.3d at 503.

2.  Execution by lethal injection is cruel and unusual punishment. We rejected this argument in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

3.  Arizona's statutory scheme for considering mitigation evidence is unconstitutional because it limits full consideration of that evidence. We rejected this argument in *State v. Mata*, 125 Ariz. 233, 241-42, 609 P.2d 48, 56-57 (1980).

4.  The State's discretion to seek the death penalty unconstitutionally lacks standards. We rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

5.  Arizona's death penalty provides no meaningful distinction between capital and non-capital cases. We rejected this argument in *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

6.  Arizona's death penalty statute is unconstitutional because it requires the imposition of death whenever at least one aggravating circumstance and no mitigating circumstances exist. We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

7.  Arizona's death penalty is unconstitutional because it fails to require the sentencer to consider the cumulative nature of mitigation, nor does it require the sentencer to make specific findings as to each mitigating factor, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. We rejected this argument in *State v. Van Adams*, 194 Ariz. 408, 423, 984 P.2d 16, 31 (1999).